UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------- x
                            :

SEPRINA T.[1],               :        NO. 3:22 CV 517(RMS)
*Plaintiff,*           :

                            :

V.                       :

                            :

KILOLO KIJAKAZI, ACTING    :
COMMISSIONER OF THE SOCIAL  :
SECURITY ADMINISTRATION,   :
*Defendant.*           :

                            :        DATE: FEBRUARY 21, 2023

                            :
------------------------------------------------------- x

### RULING ON THE PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE COMMISSIONER, OR, IN THE ALTERNATIVE, FOR REMAND FOR A REHEARING, AND ON THE COMMISSIONER'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

Before the Court is an administrative appeal filed by Seprina T. ("the plaintiff") pursuant to 42 U.S.C. § 405(g) following the denial of her application for disability insurance benefits ("DIB") and supplemental security income ("SSI"), alleging disability beginning September 18, 2018.[2] The plaintiff moves for an order reversing the decision of the Commissioner of the Social

---

[1] To protect the privacy interests of social security litigants while maintaining public access to judicial records, in opinions issued in cases filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g) ("the Act"), this Court identifies and references any non-government party solely by first name and last initial. *See* Standing Order – Social Security Cases (D. Conn. Jan. 8, 2021).

[2] Eligibility for DIB is premised, in part, on a disabled claimant's "insured status" under the Act, *i.e.*, payment into Social Security through employment for a set period prior to application. *See* 42 U.S.C. §§ 423(a)(1)(a), 423(c)(1). "SSI payments are a form of public assistance unrelated to the recipient's earnings or employment" but also require a finding of disability. *Sykes v. Bank of Am.*, 723 F.3d 399, 405 (2d Cir. 2013). *See* 42 U.S.C. § 1382(a). Under the Act, the "Commissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for a payment under [the Act]." 42 U.S.C. §§ 405(b)(1), 1883(c)(1)(A). The Commissioner's authority to make such findings and decisions is delegated to an administrative law judge ("ALJ"). *See* 20 C.F.R. §§ 404.929, 416.1429. The plaintiffs can appeal an ALJ's decision to the Social Security Appeals Council. *See* 20 C.F.R. §§ 404.967, 416.1467. If the Appeals Council declines review or affirms the ALJ's decision, then the claimant may appeal to the United States district court. Section 205(g) of the Act provides that "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the

Security Administration ("Commissioner") or, in the alternative, to remand for a rehearing on the ground that Administrative Law Judge ("ALJ") Michael McKenna erred by failing to explain his finding at step three that the plaintiff did not meet Listing 1.04(A).[3] (*See* Doc. No. 13-1 at 1). The Commissioner moves to affirm the decision below, arguing that substantial evidence supports the ALJ's finding that the plaintiff's impairments did not meet the criteria required under Listing 1.04(A). (*See* Doc. No. 15-1 at 1).

For the reasons set forth below, the plaintiff's Motion to Reverse or Remand an Administrative Agency Decision (Social Security), (Doc. No. 13), is **GRANTED**, the Commissioner's Motion for an Order Affirming the Commissioner's Decision, (Doc. No. 15), is **DENIED**, and the case is remanded for further administrative proceedings consistent with this ruling.

## I.    ADMINISTRATIVE PROCEEDINGS

The plaintiff alleges that her disability began on September 18, 2018. (Certified Transcript of Administrative Proceedings, dated November 4, 2020 ("Tr.") 16). On June 14, 2019, the plaintiff filed applications for DIB and SSI. (*Id.*). The Commissioner denied the plaintiff's applications initially on November 14, 2019, and upon reconsideration on June 23, 2020. (*Id.*).

The plaintiff requested a hearing on July 6, 2020 and appeared with an attorney by telephone before ALJ McKenna on October 16, 2020.[4] (*Id.*, citing 20 CFR §§ 404.929 *et seq.*, 404. 1429 *et seq.*, 404.936(c), 416.1436(c)). Vocational expert ("VE") Stella Frank also appeared by

---

Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3).

[3] As of April 2, 2021, Listing 1.04 was replaced by Listing 1.15. *See* 85 FR 79063, 2020 WL 7209986. The plaintiff filed her application for disability benefits on June 14, 2019; accordingly, the Court applies Listing 1.04, which was in effect when the plaintiff filed her application.

[4] The hearing was conducted virtually/telephonically due to the extraordinary circumstance presented by the COVID-19 pandemic. (Tr. 16).

telephone and testified. (Tr. 16). On November 4, 2020, ALJ McKenna issued an unfavorable decision denying the plaintiff's request for benefits. (Tr. 16-27). On February 25, 2022, the Appeals Council denied the plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (Doc. No. 13-2 at 3).

On April 7, 2022, the plaintiff filed this action. (Doc. No. 1). On May 25, 2022, the Commissioner filed the certified administrative record. (Doc. No. 8). On June 21, 2022, the plaintiff consented to a magistrate judge, (Doc. No. 11), and on June 22, 2022, the case was transferred to the undersigned. (Doc. No. 12). On July 22, 2022, the plaintiff timely filed her Motion to Reverse or Remand an Administrative Agency Decision (Social Security), (Doc. No. 13), together with a Statement of Material Facts, (Doc. No. 13-2), and a brief in support. (Doc. No. 13-1). On September 20, 2022, the Commissioner filed its Motion for an Order Affirming the Commissioner's Decision, (Doc. No. 15), together with a responding Statement of Material Facts, (Doc. No. 15-2), and a brief in support. (Doc. No. 15-1). Finally, on October 4, 2022, the plaintiff filed a reply. (Doc. No. 16).

## II.  FACTUAL BACKGROUND

The Court presumes the parties' familiarity with the plaintiff's medical history, which is thoroughly discussed in the parties' respective statements of material facts. (*See* Doc. Nos. 13-2, 15-2). The Court cites only the portions of the record that are necessary to explain this decision.

### A.  The Plaintiff's Hearing Testimony

The plaintiff is single and has two daughters, one of whom lives with her in an apartment. (Tr. 37). Her live-in daughter does not work. (Tr. 38). The plaintiff has a driver's license and typically drives two or three times per week to the grocery store, the gas station, the pharmacy,

and the doctor's office. (*Id.*). The plaintiff earned a high school diploma and took an on-the-job training class in writing to learn the Epic system at New York University ("NYU"). (*Id.*).

The plaintiff worked for NYU from 2007 until 2019. (Tr. 39). She worked in the emergency room for a year and a half before transferring to the medical billing department (*Id.*). In the emergency room, the plaintiff's duties included collecting information from patients and registering them, labeling their registration, assisting nurses and doctors as needed, and communicating with patients online. (*Id.*). She was constantly on her feet and sat down only to register patients. (*Id.*). She lifted trays of food and medication, as well as the belongings that patients brought with them to the emergency room. (Tr. 39-40). The heaviest items she lifted were approximately fifteen pounds. (Tr. 40).

While the plaintiff was assigned to the medical billing department, she was required to sit at a desk at all times except to use the bathroom and during her lunch break. (*Id.*). She was tasked with patient registration, medical billing, follow-up, and insurance verification. (*Id.*). The plaintiff also answered the phones and greeted patients at the front desk, retrieved documents from them, and then returned to her desk to verify their insurance and bill payments. (Tr. 40-41). She estimated that she spent six or seven hours per day sitting at a desk and that the heaviest items she carried were reams of paper to fill the copy machines. (Tr. 41).

In July 2017, the plaintiff was involved in a car accident that precipitated her pain and discomfort. (Tr. 43, 52). She pursued a personal injury claim and expected to receive a settlement award. (Tr. 52, 54).

For one month in 2019, the plaintiff worked in the physical therapy office at the Hospital of Central Connecticut. (Tr. 41). In that role, the plaintiff assisted the physical therapists by greeting patients at the front desk and registering them. (Tr. 42). She also answered phones,

collected documents from the fax machine, and scanned documents, all of which required that she frequently get up from her desk. (*Id.*). After one month, the plaintiff could no longer tolerate the pain in her back and hand, and she began feeling overwhelmed by stress and anxiety. (*Id.*). At that time, she was taking medication that made her lethargic in the morning, so the job became unmanageable for her. (*Id.*). Once the plaintiff stopped working, she received disability payments for six months. (Tr. 43).

The plaintiff's only other job after September 2018 was a temporary position at a Marriott hotel, which she held for one day. (*Id.*). That job required that she carry trays of food to hotel guests. (Tr. 42-43). She quickly realized that she could not continue working at the hotel because her hands were too weak, her back hurt, and she could not stand for long periods of time. (Tr. 43).

The plaintiff experienced pain in her middle and lower back, neck, and shoulder. (Tr. 44). She felt tingling down her right leg, as well as a tingling pain down her arm and in her fingers, which made it difficult for her to open things. (*Id.*). At times, she felt pain radiating from her neck down to her right shoulder. (*Id.*). To alleviate her pain, the plaintiff sought treatment from a physical therapist who showed her techniques for managing her pain at home. (*Id.*). She also took pain medication (Celebrex) to alleviate her pain and muscle relaxers to control her spasms. (Tr. 45). The medication, which she took on as-needed basis every other day, caused side effects such as drowsiness. (*Id.*).

The plaintiff underwent two surgeries, the first of which was an arthroscopy on September 20, 2017. (*Id.*). The second surgery, which occurred on September 16, 2018, was a fusion during which a disc was placed in her neck. (*Id.*). The plaintiff's doctors recommended that she undergo lower back surgery to repair a dislocated disc, but the plaintiff was afraid to go forward with it.

(*Id.*). Without a source of financial assistance, the plaintiff feared that back surgery would render her disabled to the point that she would not be able to do anything at all. (Tr. 45-46).

The plaintiff was unable to sit for more than 25 or 30 minutes at a time before experiencing stiffness, and she frequently adjusted herself to find a comfortable position. (Tr. 46). She moved slowly when getting up from a seated position. (*Id.*). She experienced pain when she stood for more than 30 or 35 minutes at a time. (Tr. 46-47). Some days, the plaintiff struggled to walk for more than half a block. (Tr. 47). She was prescribed a brace and a cane, which she often used to walk. (*Id.*). She felt most comfortable when she laid down, which she did approximately four or five times per day. (*Id.*).

The plaintiff struggled to reach with her right arm without experiencing pain that radiated through her fingertips, shoulder, and neck. (Tr. 48). Reaching forward caused the plaintiff to experience numbness and tingling in her fingers. (*Id.*). She could lift household items such as a honeydew melon, a small pot of water, a teapot, a small bottle of cleaning spray, a roll of paper towels, a can opener, and a half gallon of milk. (*Id.*). She feared that lifting a full gallon of milk would cause her muscles to spasm. (*Id.*). She struggled to open a jar without assistance. (Tr. 48-49).

The plaintiff did not feel capable of doing a job that required repeated use of her hands during an eight-hour workday because her right hand tingled and locked, and her muscles stiffened and spasmed. (Tr. 49). She had trouble typing because of the discomfort she experienced when her muscles tensed up. (Tr. 59).

The plaintiff took her time climbing stairs and limited her driving because she struggled to turn her head left and right and experienced muscle spasms. (Tr. 49).

Each month, the plaintiff would have approximately five "good days" when she felt well enough to run errands. (Tr. 50). On the other days, she experienced persistent back pain and leg tingling. (*Id.*).

The plaintiff struggled to sleep for more than four hours per night and felt woozy in the mornings. (Tr. 50-51).

Prior to the COVID-19 pandemic, the plaintiff went to physical therapy two or three times per week, treated herself at home, and took pain medication. (Tr. 54). On the day before the hearing, the plaintiff woke up at around 1:30 AM, made herself tea and breakfast, took a shower, checked her emails, made doctor appointments, did some light chores around the house, laid down, took her pain medication, and then laid down again. (Tr. 54-55). That day, she also did her physical therapy exercise two or three times to keep her joints moving and walked around the house whenever she felt stiff. (Tr. 55). Each time the plaintiff went grocery shopping, store employees helped her put her groceries in her cart and loaded them into her car; her daughter helped her take them out of her car and carry them up to their third-floor apartment. (Tr. 56). The plaintiff typically left her house to socialize approximately once per month. (*Id.*). She routinely took walks in a nearby park to get some air and then she would "just run back to [her] house." (*Id.*). In the year leading up to the hearing, the plaintiff did not travel. (Tr. 57).

The plaintiff took medication on an as-needed basis to treat the anxiety she experienced whenever her pain kicked in while she was at work. (Tr. 51).

Although the plaintiff's physical therapist was in Connecticut, most of her other treatment providers were in New York City. (Tr. 53). She took a car service from from Hartford, Connecticut, to visit her surgeon there every two months. (*Id.*). She wore neck and back braces during those trips. (*Id.*).

The plaintiff felt that she could not do any work on a full-time basis because of her lower back and muscle spasms; the numbness and tingling in her hands; and her struggle to reach. (Tr. 57-59). When she experienced a muscle spasm, she would have to stop whatever she was doing and proceed either by moving slowly or enduring the pain until it subsided. (Tr. 58). On one occasion, she experienced a muscle spasm while she was in the middle of the street. (*Id.*). She stopped to compose herself before struggling to get out of the street. (*Id.*).

**B.    The Vocational Expert's Hearing Testimony**

VE Frank testified at the plaintiff's hearing. She explained the plaintiff's RFC using various hypothetical scenarios. (Tr. 60-73).

First, VE Frank testified that there were two jobs in the Dictionary of Occupational Titles ("DOT") that encompassed the plaintiff's past work: hospital admitting clerk (semi-skilled and sedentary per the DOT but light as performed) and patient insurance clerk (skilled and sedentary per the DOT and as performed). (Tr. 60).

In the first hypothetical, the ALJ described an individual with the plaintiff's age, education, and work history who was able to perform light work (*i.e.*, occasionally lift and carry 20 pounds, and frequently lift and carry ten pounds). (Tr. 60-61). This individual could stand and walk for four hours and sit for six hours out of an eight-hour workday; occasionally reach overhead with her right upper extremity; occasionally climb ramps and stairs, ladders, ropes, and scaffolds; occasionally stoop, kneel, crouch, and crawl; and needed to avoid hazards such as heights and moving machinery. (Tr. 61). VE Frank testified that this hypothetical individual could perform the work of a patient insurance clerk as generally performed, and the work of a hospital admitting clerk as generally performed. (*Id.*). She further testified that the hypothetical individual could perform other jobs in the national economy such as a marking clerk, of which there are 65,000 in

the national economy; a shipping weigher, of which there are 9,000 in the national economy; and a booth cashier, of which there are 28,000 in the national economy. (*Id.*). Although VE Frank's testimony was consistent with the DOT, she relied on her education, training, and experience regarding overhead reaching and the amount of standing and walking required for light work since the DOT does not address those issues. (Tr. 61-62).

In a second hypothetical, the ALJ described an individual with the plaintiff's age, education, and work history who was able to perform sedentary work (*i.e.*, occasionally lift and carry ten pounds). (Tr. 62). This individual could stand and walk for two hours and sit for six hours out of an eight-hour workday; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally stoop; and never crouch. (Tr. 62-63). VE Frank testified that this hypothetical individual could perform the work of a patient insurance clerk as generally and actually performed and the work of a hospital admitting clerk as generally performed. (Tr. 63). She further testified that her testimony was consistent with the DOT. (*Id.*).

Next, the ALJ asked VE Frank if her opinion would change if either of these hypothetical individuals needed the option to sit or stand at will at her workstation. (*Id.*). VE Frank stated that many sedentary and some light occupations allow changing positions, and that her answer was dependent on whether the individual's limitations resulted in a loss of productivity. (*Id.*). If productivity could not be maintained at a level of at least 85 percent, then the hypothetical individual would be unable to perform full-time competitive work. (*Id.*). VE Frank opined that the first hypothetical individual with this additional limitation would still be capable of performing the work of a cashier and a shipping weigher because there typically would be a stool in the location where these jobs are performed. (Tr. 64). Regarding the marking clerk, however, VE

Frank testified that there would be 25 percent fewer jobs in the national economy because of the additional limitation. (*Id.*).

When asked her opinion regarding the same hypothetical individual if she was off task fifteen percent of the workday, VE Frank stated that the individual would not be able to maintain full-time competitive work. (Tr. 64-65). The DOT does not address this limitation, so VE Frank based her testimony on her education, training, and experience. (Tr. 65). VE Frank testified that if either one of the hypothetical individuals was absent from work twice per month, it would be considered excessive absenteeism at all skill levels, particularly over time and as skill level increased. (*Id.*). The DOT does not address this limitation either, but VE Frank opined based on her education, training, and experience that it would eliminate all full-time competitive work. (*Id.*).

VE Frank further testified that, if either of the hypothetical individuals required a cane to walk, work at the light exertion level would require reasonable accommodation but work at the sedentary exertion level may not. (Tr. 67). Moreover, if either of the hypothetical individuals was required to reach in all directions with both arms occasionally, then she would not be capable of doing any of the occupations VE Frank referenced. (Tr. 72). If either of the hypothetical individuals was required to finger and handle with both hands occasionally, however, then she would not be capable of doing any of the occupations VE Frank referenced but would be capable of doing some full-time work. (*Id.*). If the hypothetical individuals were unable to frequently carry objects over ten pounds, they would not be capable of doing any of the occupations referenced by VE Frank, except the job of a patient insurance clerk. (Tr. 73). If the hypothetical individuals could not repeatedly push, pull, or use a foot control, VE Frank's analysis would not change because none of the occupations she referenced involve pushing, pulling, or using foot controls. (Tr. 72-73). Similarly, VE Frank's opinion would remain the same if the hypothetical individuals took

medication causing drowsiness that prevented them from driving and operating heavy machinery since neither driving nor operating heavy machinery was an essential function any of the occupations she referenced. (Tr. 73).

### C.     The ALJ's Decision

Following the five-step evaluation process,[5] the ALJ found that the plaintiff met the insured status requirements through December 31, 2024, and that she had not engaged in substantial gainful activity since September 18, 2018, the alleged onset date. (Tr. 18).[6]

At step two, the ALJ found that the plaintiff had the following severe impairments: status post anterior cervical discectomy and fusion; partial tear of the right supraspinatus and labrum; and degenerative disease of the lumbar spine. (Tr. 19, citing 20 C.F.R. §§ 404.1520(c),

---

[5] "As the regulations for DIB and SSI are virtually identical and do not differ materially for the purposes of this case, hereinafter reference will be made only to the DIB regulations in the interest of conciseness." *Peterson v. Kijakazi*, No. 3:22 CV 26(VLB), 2023 WL 334379, at *5 n.7 (D. Conn. Jan. 20, 2023); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003) (explaining in a Social Security case that for "simplicity's sake, we will refer only to the Title II provisions, but our analysis applies equally to Title XVI"). An ALJ determines a claimant's disability using a five-step analysis. *See* 20 C.F.R. § 404.1520. First, an ALJ must determine whether a claimant is currently working. *See* 20 C.F.R. § 404.1520(a)(4)(i). If a claimant is currently employed, then the claim is denied. *Id.* If a claimant is not working, however, then an ALJ must make a finding as to the existence of a severe mental or physical impairment. If none exists, then the claim is denied. *See* 20 C.F.R. § 404.1520(a)(4)(ii). If a claimant is found to have a severe impairment, however, then an ALJ must compare the claimant's impairment with those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Regulations ("the Listings"). *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79-80 (2d Cir. 1998). If a claimant's impairment meets or equals one of the impairments in the Listings, then the claimant is automatically considered disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If a claimant's impairment does not meet or equal one of the listed impairments, however, then the claimant must show that he cannot perform his former work. *See* 20 C.F.R. § 404.1520(a)(4)(iv). If a claimant shows that he cannot perform his former work, then the burden shifts to the Commissioner to show that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted). A claimant is entitled to receive disability benefits only if he shows that he cannot perform his former work and the Commissioner fails to show that the claimant can perform alternate gainful employment. *See* 20 C.F.R. § 404.1520(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

[6] The plaintiff attempted unsuccessfully to work after the alleged disability onset date and her earning records show that she earned $6,817.54 in 2019. (Tr. 18, citing Tr. 249-251). The plaintiff testified that she received temporary disability payments after she left her job in September 2018 because she was involved in a car accident. (Tr. 18, 43). She also reported that she worked in a physical therapy office for one month in 2019 but promptly left because of the pain in her back and hand, together with the stress and anxiety she was experiencing. (Tr. 18, 42-43). Because the plaintiff took a significant break from working after September 2018 due to her impairments, she returned to work for less than three months, and she eventually stopped working due to her impairments, the ALJ considered her 2019 work activity to be an "unsuccessful work attempt." (Tr. 19). Accordingly, the ALJ found that the plaintiff had not engaged in substantial gainful activity since the alleged onset date despite her 2019 earnings. (*Id.*).

416.920(c)). The ALJ concluded that these medically determinable impairments significantly limited the plaintiff's ability to perform basic work activities. (Tr. 19). In addition to her severe impairments, the plaintiff suffered from depression and anxiety. (*Id.*). The ALJ concluded that the plaintiff's medically determinable mental impairment of anxiety was not severe in that it did not cause more than minimal limitation to her ability to perform basic mental work activities. (*Id.*). Moreover, the plaintiff's treatment notes show that she had a body mass index score of 34, but that she was not limited by her body size. (*Id.*). Therefore, the ALJ concluded that the plaintiff's obesity was not severe and did not result in more than minimal work-related limitations. (*Id.*).

The ALJ concluded at step three that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App'x 1. (Tr. 20, citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926).

The ALJ evaluated the plaintiff's right shoulder impairment under Listing 1.02, which applies to major joint dysfunction. (Tr. 20). The ALJ found no indication in the record that the plaintiff's impairment involved "one major peripheral joint in each upper extremity resulting in the inability to perform fine and gross movements effectively." (*Id.*). Indeed, examination notes generally showed that the plaintiff had only slightly reduced (4/5) strength in her right upper extremity, which did not meet the criteria of Listing 1.02. (*Id.*).

The ALJ evaluated the plaintiff's degenerative disc disease of the cervical and lumbar spine under Listing 1.04, which applies to spinal disorder. (Tr. 21). According to the ALJ, although imaging in the record showed that the plaintiff suffered from cervical stenosis and lumbar spondylosis, there was no evidence that these conditions rendered her unable to walk. (*Id.*). Indeed, the plaintiff was able to ambulate with the assistance of a cane. (*Id.*). The ALJ also found no

evidence of "nerve root compression characterized by motor loss or spinal arachnoiditis." (*Id.*). Accordingly, the ALJ concluded that the plaintiff's degenerative disc disease did not meet the criteria of Listing 1.04. (*Id.*).

The ALJ determined that the plaintiff had the residual functional capacity ("RFC") to perform light work, as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except she was capable of standing and walking for four hours and sitting for six hours out of an eight-hour workday; occasionally reaching overhead with the right upper extremity; occasionally climbing ramps and stairs, ladders, ropes, and scaffolds; and occasionally stooping, kneeling, and crawling. (*Id.*). she also needed to avoid hazards such as heights and moving machinery. (*Id.*).

At step four, the ALJ found that the plaintiff was capable of performing her past relevant work as a hospital admitting clerk and a patient insurance clerk, neither of which required the performance of work-related activities precluded by the plaintiff's RFC. (Tr. 26, citing 20 C.F.R. §§ 404.1565, 416.965). The ALJ considered VE Frank's testimony regarding the plaintiff's past relevant work as a hospital admitting clerk, a semi-skilled position at a sedentary level but performed at a light exertional level, and a patient insurance clerk, a skilled position at a sedentary exertional level and performed as such. (Tr. 26). The ALJ also considered VE Frank's testimony that an individual with the plaintiff's age, education level, and RFC could perform the plaintiff's past relevant work as a hospital admitting clerk as generally performed and as a patient insurance clerk as generally and actually performed. (*Id.*). Accordingly, the ALJ concluded that the plaintiff was not under a disability at any time between September 18, 2018, the alleged disability onset date, and November 4, 2020, the date of the ALJ's decision. (Tr. 26, citing 20 C.F.R. §§ 404.1520(g), 416.920(f)).

## III.    STANDARD OF REVIEW

Disabled individuals are entitled to receive benefits under the Social Security Act. *See* 42 U.S.C. §§ 423(a)(1), 1381a. To be considered disabled and therefore entitled to DIB and SSI, a claimant must demonstrate that she is unable to work "by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or is expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Such impairment must be "of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 416.920(c) (requiring that an impairment or combination thereof "significantly limit[] . . . physical or mental ability to do basic work activities" in order to be considered "severe").

When an ALJ determines that a claimant is not disabled and the Commissioner upholds the ALJ's decision, the claimant may seek judicial review by a district court. *See* 42 U.S.C. § 405(g). In this capacity, the district court performs "an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). When reviewing a denial of benefits, a district court may not make a *de novo* disability determination. *Wagner v. Sec'y of Health & Human Serv's*, 906 F.2d 856, 860 (2d Cir. 1990). Rather, the court's function is to ascertain whether the ALJ applied the correct legal principles in reaching his conclusion, and whether his decision is supported by substantial evidence. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1153 (2019). ("On judicial review, an ALJ's factual findings . . . 'shall be conclusive' if supported by 'substantial evidence'") (quoting 42 U.S.C. § 405(g)). Absent legal error, the district court may not set aside an ALJ's decision if it is supported by substantial evidence. *See Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). Stated otherwise, if an ALJ's decision is supported by substantial evidence, then that decision will be sustained, even where there may also be substantial evidence to support a claimant's contrary position. *Id.*

"Substantial evidence" is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *Biestek*, 139 S. Ct. at 1154 ("[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high"). The substantial evidence standard is "a very deferential standard of review—even more so than the 'clearly erroneous' standard," and the Commissioner's findings of fact must be upheld unless "a reasonable factfinder would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in original) (citations omitted). "[A district court] must 'consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight.'" *Petrie v. Astrue*, 412 F. App'x 401, 403-04 (2d Cir. 2011) (quoting *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)).

## IV.   DISCUSSION

In support of her motion, the plaintiff argues that the ALJ failed to explain his step three finding that her impairments did not meet or equal the criteria for Listing 1.04(A). (*See* Doc. No. 13-1 at 1). The Commissioner disputes the plaintiff's arguments, asserting instead that substantial evidence supports the ALJ's finding. (*See* Doc. No. 15-1 at 1). In her reply, the plaintiff asserts that the ALJ misstated medical facts, failed to apply the medical facts to the requirements of Listing 1.04(A), and failed to explain the basis for his finding that her impairments did not meet or equal the Listing. (*See* Doc. No. 16 at 1).

### A.   The ALJ's Analysis of Listing 1.04(A)

The plaintiff argues that the ALJ erred in explaining the basis for his finding that her impairments did not meet or equal Listing 1.04(A). The Court agrees.

To qualify under Listing 1.04(A), a claimant's spinal disorder must result in compromise of a nerve root or the spinal cord, and must be accompanied by

> [e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 1.04(A).[7]

The plaintiff has the burden of proof at step three to show that her impairments meet or medically equal a Listing. *See Naegele v. Barnhart*, 433 F. Supp. 2d 319, 324 (W.D.N.Y. 2006). "For a claimant to qualify for benefits by showing that [her] unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, [she] must present medical findings equal in severity to *all the criteria* for the one most similar listed impairment." *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990) (emphasis added). Indeed, "[a]n impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Id.* (citing SSR 83-19, 1983 WL 31248).

Courts have required an ALJ to provide an explanation as to why the claimant failed to meet or equal the Listings, "[w]here the claimant's symptoms as described by the medical evidence appear to match those described in the Listings." *Kuleso v. Barnhart*, 232 F. Supp. 2d 44, 52 (W.D.N.Y. 2002). If an ALJ's decision lacks an express rationale for finding that a claimant does

---

[7] The Commissioner asserts that "the simultaneous presence of all of the medical criteria in paragraph A must continue, or be expected to continue, for a continuous period of at least 12 months." (Doc. No. 15-1 at 5, citing Social Security Acquiescence Ruling ("AR") 15-1(4), 80 FR 57418-02, 2015 WL 5564523, at *57420 (Sept. 23, 2015) (emphasis added)). As stated in the AR, however, "[t]his Ruling applies only to claims in which the claimant resides in Maryland, North Carolina, South Carolina, Virginia, or West Virginia at the time of the determination or decision at any level of administrative review." *Id.* Insofar as AR 15-1(4) does not apply to claims brought by claimants residing in Connecticut, this Court will not be guided by it. But even if the time limitation articulated in AR 15-1(4) applied here, the Commissioner has not demonstrated how the record evidence fails to satisfy such a requirement. Moreover, the ALJ did not reach his conclusion that the plaintiff's impairments failed to meet or equal Listing 1.04(A) on the basis that they were not simultaneously present for a period of at least 12 months, so it does not appear that AR 15-1 had any bearing on the ALJ's analysis at step three. The Court cannot affirm "administrative action on grounds different from those considered by the agency." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal quotation omitted).

not meet a Listing, however, a court may still uphold the ALJ's determination if it is supported by substantial evidence. *Berry v. Schweiker*, 675 F.2d 464, 468 (2d Cir. 1982).

Here, the ALJ determined that the plaintiff did not meet the criteria for Listing 1.04(A) because he found "no evidence of nerve root compression characterized by motor loss."[8] (Tr. 21). Although the ALJ's step three analysis of Listing 1.04 is contained in a single paragraph of his decision, his detailed review of many of the plaintiff's medical records appears later in his decision. (*See* Tr. 21-26). Following his RFC decision, the ALJ described the imaging of the plaintiff's lumbar spine in 2017, prior to the alleged onset date, which revealed a left-sided disc bulge at L3-L4; a left-sided herniation of the L4-L5 disc with encroachment of the left intervertebral foramen; central herniation of the L5-S1 disc with impression and distortion of the thecal sac, with the disc extending just right of midline with loss of disc space height at L5-S1; and mild productive changes of the facet joints at the L3-L4, L4-L5, and L5-S1 discs. (Tr. 22, 357-58).

Next, the ALJ considered treatment notes dated July 6, 2017, which indicate that, on examination, the plaintiff showed positive tenderness to palpation over the cervical paraspinal muscles, indicative of spasm, as well as limited range of motion. (Tr. 22, citing Tr. 368-69). The ALJ reviewed treatment records from August 2018 in which the plaintiff complained of severe pain in her low back and reported that she was having difficulty working full time. (Tr. 22, citing Tr. 402-03). Based on the limited range of motion in the plaintiff's cervical spine, tenderness to palpation, spasm, and positive straight leg raise[9] on the right, she was diagnosed with lumbar disc herniation with radiculopathy. (Tr. 22, 403-04). The ALJ also reviewed records from an MRI of

---

[8] Although the ALJ concluded that "the claimant's degenerative disc disease does not meet the criteria of listing 1.04," (Tr. 21), the Court addresses only those aspects of the ALJ's decision that concern Listing 1.04(A) since the plaintiff has acknowledged that Listings 1.04(B) and (C) are not relevant to this Court's analysis. (*See* Doc. No. 13-1 at 3-4).

[9] The straight leg raise test is commonly used by physicians to assess for lumbosacral nerve root irritation. *See* Gaston O. Camino Willhuber & Nicolas S. Piuzzi, Straight Leg Raise Test (Feb. 20, 2023, 3:18 PM), https://www.ncbi.nlm.nih.gov/books/NBK539717/.

the plaintiff's cervical spine on August 6, 2017, which showed straightening of the normal cervical lordosis consistent with spasm. (Tr. 22, 419).

The ALJ considered that the plaintiff underwent an anterior cervical discectomy and fusion on September 16, 2018 for herniated cervical discs at C5-C7, and that she reported during a postoperative visit on October 12, 2018 that her symptoms had worsened; she was unable to work and required assistance with activities of daily living such as cooking, chores, and lifting; she was unable to walk more than three-to-five blocks; and she needed a cane/walker to ambulate. (Tr. 22, citing Tr. 400, 405). The ALJ also considered that postoperative examination revealed limited range of motion of the plaintiff's cervical and thoracolumbar spine. (Tr. 22, 406).

Next, the ALJ considered the findings from an x-ray of the plaintiff's cervical spine on November 15, 2018, which showed that she had a C5-C7 fusion and suffered from degenerative spondylosis of the cervical spine, as well as an x-ray of the plaintiff's lumbar spine on February 4, 2019, which showed degenerative changes of the spine at the L4-L5 level with advanced degenerative disc disease. (Tr. 23, citing Tr. 423-24, 545, 548). The ALJ also considered records from the plaintiff's follow-up appointment on February 15, 2019, during which she continued to report that her symptoms had worsened and that she was unable to lift, twist, or bend. (Tr. 23, citing Tr. 410). Examination notes from that appointment indicate that the plaintiff had difficulty mounting the examination table, as well as a limited range of motion of her cervical and thoracolumbar spine. (Tr. 23, 411). The plaintiff was diagnosed with lumbar disc radiculopathy and had surgical limitations for transforaminal lumbar interbody fusion. (Tr. 23, 412).

The ALJ considered that the plaintiff continued to report the same symptoms between April 26, 2019 and September 17, 2019, and that notes from her examinations continued to contain the same findings during that period. (Tr. 23, citing Tr. 413-18, 518-24, 553-57). The ALJ further

considered that the plaintiff was fitted with a cervical spine soft collar during a June 21, 2019 appointment, and that on September 17, 2019, she was fitted for neck and back braces. (Tr. 23, citing Tr. 518, 524).

The ALJ reviewed the December 10, 2019 MRI of the plaintiff's lumbar spine, which revealed multilevel degenerative spondylitic changes with a right L5-S1 subarticular/foraminal protrusion causing mass effect on the traversing right S1 and exiting right L5 nerve roots. (Tr. 23, citing Tr. 546-47). He also reviewed the December 12, 2019 CT scan of the plaintiff's cervical spine, which revealed postoperative findings of anterior cervical discectomy and fusion, as well as solid osseous fusion from C5 to C7; no significant spinal canal stenosis; and moderate neural foraminal stenosis on the left at C5-C6 and on the right at C6-C7. (Tr. 23, citing Tr. 541-42).

In addition, the ALJ considered that, on January 31, 2020, Dr. Joseph Pyun diagnosed the plaintiff with lumbar disc herniation with radiculopathy, cervical herniated nucleus pulposus with myelopathy, and impingement syndrome of the right shoulder. (Tr. 23, citing Tr. 550, 559-64, 570-75). Dr. Pyun recommended that the plaintiff undergo transforaminal lumber interbody fusion at L4-S1 after she reported that her symptoms persisted, she continued to have trouble mounting the examination table and disrobing and displayed limited range of motion of her cervical and thoracolumbar spine. (*Id.*).

The ALJ reviewed records from the plaintiff's physical therapy on November 26, 2018, which showed that she used a single point cane in her left hand; wore a cervical neck brace; and displayed decreased cervical range of motion, as well as significant tenderness to palpation in the bilateral cervical paraspinal and upper trapezius musculatures. (Tr. 24, citing Tr. 496-98).

The ALJ also reviewed records from the plaintiff's physical therapy on December 13, 2018, which showed that she responded well to outpatient physical therapy interventions and that her

functional mobility and ability to participate in her daily activities had positively progressed, but also that she continued to present with notable limitations and impairments secondary to postsurgical pain and weakness. (Tr. 24, citing Tr. Tr. 484-85).

The ALJ considered records from the plaintiff's physical therapy between January 10, 2019 and April 4, 2019, which showed fluctuations in recurrence and improvement of the plaintiff's pain. (Tr. 24, citing Tr. 447-72).

Finally, the ALJ reviewed notes from an evaluation of the plaintiff on April 4, 2019, which showed that she used a single point cane in her left hand; wore a cervical neck brace; and displayed decreased cervical range of motion, 4/5 strength with active cervical range of motion, significant tenderness to palpation in the bilateral cervical paraspinal and upper trapezius musculatures, increased cervical range of motion in all planes, and pain provocation with overhead activities. (Tr. 24, citing Tr. 443-44).

In determining the plaintiff's RFC, the ALJ concluded, based on the medical evidence in the record, that the plaintiff suffered from neck, back, and right shoulder pain after a car accident; required a shoulder arthroscopy and cervical fusion and was recommended for a lumbar fusion; and was prescribed a cane, a neck brace, and a back brace. (Tr. 24). The ALJ noted that, although the plaintiff showed some improvement in her functional mobility and pain with physical therapy, her examinations showed positive findings of limited range of motion of the spine. (*Id.*).

Contrary to the ALJ's findings, however, there is evidence of nerve root compression in the record. (*See* Tr. 21). Specifically, the plaintiff's medical records reflect that she was diagnosed with cervical disc herniation with myelopathy and radiculopathy that resulted in symptoms despite surgical intervention, as well as lumbar disc herniation with radiculopathy and herniated nucleus pulposus with foraminal stenosis. (Tr. 518, 522, 559). Indeed, cervical and lumbar radiculopathy

are evidence of nerve root compression. *Norman v. Astrue*, 912 F. Supp. 2d 33, 78 (S.D.N.Y. Sept. 25, 2012). Moreover, MRI imaging that the ALJ referenced in his decision shows degenerative changes that caused neural narrowing in the cervical spine and impacted the L5 nerve root in the lumbar spine. (Tr. 23, 406, 419, 543-44).

The ALJ's statement that the record does not contain evidence of motor loss is similarly erroneous. (*See* Tr. 21). Listing 1.04(A) defines "motor loss" as "atrophy with associated muscle weakness" or "muscle weakness." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 1.04(A). As the ALJ identifies in his decision, the plaintiff's medical records contain multiple findings of muscle weakness. (*See* Tr. 22-24, 406, 411, 414, 417, 435-36, 444, 481, 495, 521, 561-62). There can be no question then that the plaintiff experienced motor loss.

The ALJ did not state explicitly that he based his step three finding on any of the other factors required under Listing 1.04(A), so the Court cannot determine what role, if any, these factors played in his analysis. (*See* Tr. 21). Regardless, the record contains evidence that the plaintiff reported and exhibited neuro-anatomic distribution of pain in both the upper and lower extremities (*see* Tr. 402, 405-06, 410, 413, 435, 495, 518-19, 559-60); limited range of motion of both the cervical and lumbar spine (*see* Tr. 403, 406, 411, 414, 435, 444, 481, 484, 495, 520, 561); reflex and sensory changes in the upper and lower extremities (*see* Tr. 402-03, 406, 410-11, 413-14, 417, 518-20, 561-62); and positive straight leg raise on the right side[10] (*see* Tr. 403, 406, 411,

---

[10] The plaintiff's medical records do not specify whether the plaintiff's straight leg raise test was performed in a seated position, a supine position, or both. (*See* Tr. 403, 406, 411, 520, 561-562). Although the plaintiff initially bore the burden of demonstrating that her limitations met or equaled Listing 1.04(A), the ALJ was required to explain why the plaintiff failed to meet or equal the Listings since the limitations described in the plaintiff's medical records appear to meet or equal the requirements of Listing 1.04(A). *See Ramirez Morales v. Berryhill*, No. 6:17 CV 6836(MAT), 2019 WL 1076088, at *3 (W.D.N.Y. Mar. 7, 2019) (quoting *Rockwood v. Astrue*, 614 F. Supp. 2d 252, 273 (N.D.N.Y. 2009) (where the plaintiff's straight leg test results were positive but the position in which the test was performed was unclear, the Court remanded, noting that it was the ALJ's duty to seek clarification of an ambiguity in the record, especially because there was "at least a colorable case that [the plaintiff met] the requirements of Listing 1.04(A)" and the ambiguity was critical to a finding of disability)).

520, 561-562). This evidence appears to satisfy all the factors required under Listing 1.04(A) for both lumbar *and* cervical spinal impairments. 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 1.04(A). Accordingly, the record evidence suggests that the plaintiff's impairments could meet or equal the requirements in Listing 1.04(A). The ALJ was required to explain why, in the face of this evidence, he reached a contrary conclusion, but he failed to do so.

Although the ALJ appears to have considered the records containing evidence of nerve root compression and motor loss, it is unclear whether and to what extent his consideration of those records impacted his analysis and informed his finding that there is "no evidence of nerve root compression characterized by motor loss or spinal arachnoiditis." (Tr. 21). The ALJ twice stated at step three that his analysis was "documented later in [his] decision"; however, he never applied the specific criteria of Listing 1.04 to the medical evidence in the record. Instead, the ALJ appears to have relied on the assumption that his description of the medical evidence would be sufficient to explain the rationale behind his finding that the plaintiff's limitations did not meet or equal the requirements of Listing 1.04(A). Such an inadequate explanation is particularly problematic where, as here, there is evidence in the record that appears to satisfy each of the factors required to meet or equal a Listing. In light of the ALJ's scant analysis, the Court cannot conclude that his step three finding is supported by substantial evidence. The ALJ's error at step three is not harmless and warrants remand.

Accordingly, the matter is remanded to the Commissioner for further proceedings consistent with this ruling. On remand, the Commissioner shall perform a proper and complete evaluation of the medical evidence as it relates to Listing 1.04(A) and shall clarify the position(s) in which the plaintiff's straight leg raise tests were performed. Additionally, if necessary, the

Commissioner may order a consultative examination to assist the ALJ in determining whether the plaintiff's limitations meet or equal the requirements of Listing 1.04(A).

## V.    CONCLUSION

For the reasons stated above, the plaintiff's Motion to Reverse or Remand an Administrative Agency Decision (Social Security), (Doc. No. 13), is **GRANTED**, the Commissioner's Motion for an Order Affirming the Commissioner's Decision, (Doc. No. 15), is **DENIED**, and the case is remanded for further administrative proceedings consistent with this ruling.

This is not a recommended ruling. The parties' consent to a magistrate judge allows the undersigned to direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure. Appeals from this judgment may be made directly to the appropriate United States Court of Appeals. *See* 28 U.S.C. § 636(c)(3); FED. R. CIV. P. 73(c).

The Clerk is further instructed that, if any party subsequently appeals to this court the decision made after remand, the appeal shall be assigned to the undersigned as the parties have consented the Court's jurisdiction.

Dated this 21st day of February 2023 at New Haven, Connecticut.

 /s/ Robert M. Spector, USMJ
Robert M. Spector
United States Magistrate Judge
